IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀No. 3:19-PO-5-DCP
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
TERRY W. MCJUNKIN,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendant,⠀⠀⠀⠀)

**MEMORANDUM AND ORDER**

⠀⠀⠀⠀This case is before the undersigned on a Petition for Summons for Offender [Doc. 6], alleging Defendant Terry McJunkin violated the terms of his probation by hunting and by being in the Cherokee National Forest. On March 11, 2019, the Court sentenced Defendant, who was convicted of ten counts of hunting over bait, to five years of unsupervised probation [Doc. 4]. Special conditions of Defendant's probation were that Defendant was banned from hunting anywhere for five years and banned from all national forests, including the Cherokee National Forest, for five years [*Id*. at 4]. A caveat to this second special condition permitted Defendant to travel in a motor vehicle on paved roads through the national forest but prohibited him from possessing hunting equipment, including firearms designed for hunting, during such travels [*Id*.]. The Government asks the Court to revoke Defendant's probation and sentence him to a term of imprisonment.

⠀⠀⠀⠀The Court held a revocation hearing on August 31, 2023, and continued the hearing on September 27, 2023. Based upon the evidence presented at the revocation hearing, the Court finds by a preponderance of the evidence that Defendant has violated the terms of his probation. For the reasons stated herein, Defendant's probation will be revoked, and the Court will resentence Defendant at a sentencing hearing to be set by the Court. 18 U.S.C. § 3565(a)(2).

# I.       BACKGROUND AND EVIDENCE

On March 11, 2019, Defendant Terry McJunkin entered guilty pleas to ten counts of hunting over bait in violation of 36 C.F.R. 261.8(a) [Doc. 4 pp. 1–2]. These offenses occurred in the Cherokee National Forest. The Court sentenced Defendant to a five-year term of unsupervised probation and imposed two special conditions [*Id*. at 3–4]. First, Defendant is "banned from hunting anywhere for a period of five (5) years" [*Id*. at 4]. Second, Defendant is "banned from all national forests for a period of five (5) years, including but not limited to Cherokee National Forest" [*Id*.]. Because access to Defendant's home required travel through the Cherokee National Forest, the second condition stated that Defendant "shall be permitted to travel in a motor vehicle on paved roads through the national forest, but [he] shall not possess any hunting equipment (including firearms designed for hunting) during such travels" [*Id*.]. Defendant's probation commenced on March 11, 2019, and the five-year term expires on March 10, 2024.

According to the Petition, on January 31, 2023, United States Forest Service ("USFS") Officer Shawn Reece provided the United States Probation Office ("USPO") photographic images and video recordings purporting to show Defendant hunting in the Cherokee National Forest [Doc. 6 p. 2]. Officer Reece also relayed reports that Defendant was in possession of firearms while hunting [*Id*.]. The USPO requested the issuance of a summons and for Defendant to appear before the Court for a hearing to determine whether his probation should be revoked [*Id*.].

The parties appeared before the undersigned for a probation revocation hearing on August 31, 2023, and again on September 27, 2023. Assistant United States Attorney Luke McLaurin appeared on behalf of the Government. Attorney Joshua D. Hedrick represented

Defendant, who also appeared on both dates. The Government presented the testimony of Veronica Byrd, USFS Officer Shawn Reece, and Tennessee Wildlife Resources Agency ("TWRA") Officer Kip Kite. Defendant presented the testimony of Dennis Wilson and Jack Watson and testified in his own behalf. The Government recalled Officer Reece in rebuttal.

Veronica Byrd testified that she has known Defendant for over a decade and was in a relationship with him from May 2021 to February 2022. Ms. Byrd said she was aware that in 2019, Defendant entered a guilty plea to hunting over bait in the Cherokee National Forrest and that he was on probation which prohibited him from hunting in the national forest. She stated that she observed Defendant violate that condition by hunting on a weekly basis. Ms. Byrd testified that before they were in a relationship, Defendant visited her ex-husband regularly, and that after her relationship with Defendant ended, she was aware of Defendant's activities based upon their mutual friends and Defendant's girlfriend's social media posts. She believed that Defendant also hunted on a weekly basis from 2019 to the time they dated and from the time they stopped dating to the present. Ms. Byrd said Defendant hunted year-round except for a couple of months in winter and spring. She stated that he hunted deer, bear, hogs, and other animals. She said that Defendant hunted with a gun and used dogs and traps and that sometimes he hunted from his truck at night using a spotlight.

Ms. Byrd stated that in April or May 2019, Defendant brought four turkeys to her ex-husband. She said she was asked to leave a cooler outside, and Defendant placed the turkeys in the cooler and covered them with ice. Ms. Byrd said Defendant brought the turkeys because he did not like turkey legs and said he had killed too many turkeys already. Ms. Byrd stated that Defendant explained his hunting, despite his probation condition prohibiting hunting, as recouping the money he spent on his lawyer's fees and other money spent in relation to his case.

Ms. Byrd said Defendant sent her videos, via text message, while he was hunting. She believed Defendant sent the videos on the day he recorded them. She testified about the videos and screenshots from her cellular phone showing the date she received those videos. According to Ms. Byrd, on July 31, 2021, Defendant sent her a video showing Defendant with his son, who was posing with a dead boar [Exh. 1 & 1A]. She stated that this video was made behind her house on land in the Cherokee National Forest, which abuts her property. She said Defendant later told her that he had set a trap in the national forest and took his son to check the trap. According to Ms. Byrd, Defendant told her that he and his son found a wild boar in the trap, killed it, and removed it from the trap to make the video. She did not know whether Defendant or his son killed the boar.

Ms. Byrd testified that Defendant sent her a hunting video on October 10, 2021 [Exh. 2 & 2A]. This video shows several men in the woods with guns and hunting dogs. Ms. Byrd said Defendant narrates the video in which the hunting dogs have treed a bear. She said she recognized the other men in the video as friends with whom Defendant went hunting. She said Defendant told her that he and the men were bear hunting on the video.

Ms. Byrd identified a third hunting video sent by Defendant on October 23, 2021 [Exh. 3 & 3A]. The video depicts Defendant's friend Matthew in the woods with hunting dogs, two guns on the ground, and a dead bear [Exh. 3]. Ms. Byrd said Defendant narrates the video. She said Defendant told her that he was bear hunting in the video and later told her that he was the one who shot the bear. She recognized the location of the video as being in the national forest not far from her house. Ms. Byrd said Defendant references two types of whiskey in the video. She said Defendant drinks whiskey daily. Ms. Byrd estimated that Defendant drinks one and one-half cases of beer per day and a gallon of whiskey over two days.

Ms. Byrd testified that on October 24, 2021, Defendant sent her a video filmed in his driveway [Exh. 4 & 4A]. The video depicts a dead deer in the bed of a pickup truck [Exh. 4]. Ms. Byrd stated that Defendant narrates this video and states, on the video, that he and Matthew Millsaps were taking a break from bear hunting and that neither of them have hunting licenses. She said the truck in the video belonged to Matthew.[1] Ms. Byrd said Defendant later told her that he shot the deer that was in the truck.

Ms. Byrd identified a photograph of her nine-year-old son sitting astride a dead deer in the back of Defendant's pickup truck [Exh. 5]. She said Defendant took this photograph and sent it to her on December 28, 2021 [Exh. 5A]. Ms. Byrd said she knew Defendant killed this deer on the date the photo was taken because she was with him when he killed it from his truck while "spotlighting," which involves using a large light to spot game in the dark.

Ms. Byrd stated that while they were dating, she and Defendant went hiking in the Cherokee National Forrest on a weekly basis. She said because of his probation condition prohibiting him from being in the national forest, she would drive. She identified a photograph of her and Defendant at Fall Branch Falls in the national forest on April 11, 2021 [Exh. 6 & 6A]. Ms. Byrd said that she and Defendant hiked through the Cherokee National Forest to get to the location of that photograph. She also identified a photograph of Defendant that she took at Coker Creek Falls on May 31, 2021 [Exh. 7 & 7A]. She said that she and Defendant hiked through the Cherokee National Forest to get to the location of this photograph. Ms. Byrd identified a photograph of Defendant and herself at Waucheesi tower in the Cherokee National Forest taken on June 13, 2021 [Exh. 8, 8A, & 8A2].

---

[1] Ms. Byrd also identified a puppy in the video and indicated Defendant was training the puppy to be a hunting dog.

Ms. Byrd testified that she and Defendant ended their relationship in February 2022. She stated that the following month, March 2022, she was involved in an incident in which she found a cellular telephone belonging to another woman in Defendant's truck. Ms. Byrd testified that the owner of the cellphone accused her of stealing it. Ms. Byrd said she ultimately entered a guilty plea to a theft charge and paid for the cellphone so that she could move on with her life. She testified that Defendant brought allegations of assault against her in a case that is presently pending. Ms. Byrd said her lawyer and the prosecutor thought the assault charge would be dismissed.

Ms. Byrd stated that after she provided information to law enforcement about Defendant hunting, Defendant and his friends attempted to contact her. She said during the week of July 4, 2023, Defendant's friend Denny Wilson told her that she needed to take a step back and not involve herself. Ms. Byrd said Defendant also left two unsigned notes in her mailbox. She said on July 13, 2023, she found a note in her mailbox asking if she wanted to have sexual relations [Exh. 9]. Ms. Byrd said she recognized the handwriting on the note as being Defendant's handwriting. She said she found a second note, also in Defendant's handwriting, in her mailbox, stating, "I just want to tell you I'm sorry for what happened[.] Never got to say that to you" [Exh. 10]. Ms. Byrd testified that she believed that by leaving these notes, Defendant was attempting to influence her to not testify in this matter. She stated that many of her and Defendant's mutual friends have called her a "snitch," and she no longer maintains those friendships. She stated that she bears no ill feelings toward Defendant and is testifying because she believes it is the right thing to do.

On cross-examination, Ms. Byrd testified that she found Brittany Boring's cellphone in Defendant's truck, but he was not dating Ms. Boring at that time. The officer's affidavit of

6

complaint states that Ms. Byrd admitted finding the cellphone in Defendant's truck, took the cellphone to her residence, and threw it outside into the vegetation during a heavy rain [Exh. 11, Affidavit of Complaint of Monroe County Sheriff's Deputy Tyler Bryson]. Ms. Byrd said she initially received judicial diversion for the theft charge, but her diversion was revoked. She acknowledged that she paid $941 in restitution for the theft charge. Ms. Byrd also acknowledged that she was the subject of a petition for a restraining order regarding a Department of Children's Services referral for physical abuse of Defendant's minor daughter.

Also, on cross-examination, Ms. Byrd agreed that she was arrested on July 25, 2022, for domestic assault against Defendant and for breaking his cellphone [*See* Exh. 13]. Ms. Byrd has a pending charge for domestic assault that arose out of the circumstances culminating in her arrest [*See* Exh. 14]. Ms. Byrd declined to answer further questions about the assault case, invoking her Fifth Amendment right.[2] However, Ms. Byrd acknowledged that she was arrested in front of two of her children, who were ages thirteen and nine at that time. She denied being upset about this arrest. She agreed that she hired a lawyer to represent her in the assault case. She acknowledged that retaining counsel is a significant expense to her, a single mother of four children.

On redirect examination, Ms. Byrd stated that she divorced her husband in March 2021 and began dating Defendant after that in the spring of 2021. She said her divorce became final in April or May 2021. She agreed that she dated Defendant until February 2022. She denied that she ever went hiking alone with Defendant or took romantic photos with Defendant while still married to her ex-husband. She denied having any training in computer science or knowing how to alter the metadata on photographs on a cellphone. She said she did not know how to generate

---

[2]     The Court declined to strike Ms. Byrd's testimony, finding the assault charge bears only on her general credibility, rather than the elements of the alleged probation violation, and that defense counsel had other information to test her credibility and motive for testifying.

false photographs or video recordings. She denied fabricating the videos and photographs in Exhibits 1 through 8, all of which depict events occurring after March 11, 2019.

Ms. Byrd said that since her testimony on August 31, 2023, Defendant's girlfriend has called her names on Facebook, and someone placed nails at the end of her driveway. On recross-examination, Ms. Byrd testified that she had orders of protection against her by Eric O'Connor, her son Hunter Ogle, her ex-husband Randal Ogle, and Miranda Shaw, all of which were dismissed.

USFS Officer Shawn Reece testified that he works in the Tellico Ranger District of the Cherokee National Forest. As a part of his job, he enforces Tennessee hunting regulations. He stated that hunting is defined as worrying or chasing an animal with the intent to kill, without regard to whether the animal is killed. Officer Reece stated that stalking an animal through the woods, waiting for an animal in a tree stand, chasing an animal with dogs, and luring an animal into a trap are all hunting. After reviewing the video of the men in the woods with hunting dogs [Exh. 2], Officer Reece testified that the men were hunting. He stated that in the spring of 2021, hunters were permitted to kill four turkeys. Officer Reece stated that when hunting turkey, bear, deer, or elk, a hunter must wear 500 square inches of blaze orange.

Officer Reece stated that Fall Branch Falls, Coker Creek Falls, and Waucheesi radio tower are all inside the Cherokee National Forrest. He stated that to get to any of these locations, an individual would have to walk or travel on gravel roads through the Cherokee National Forest. Officer Reece identified the location depicted in Exhibit 7 as Coker Creek Falls. He also identified the Waucheesi radio tower in Exhibit 8.

Officer Reece testified that in addition to Defendant's 2019 convictions for hunting over bait, Defendant was convicted of hunting over bait, hunting bear in a closed season, and littering

in the Cherokee National Forest in 2005. On cross-examination, Officer Reece stated that there is no restriction on trapping or killing a nuisance animal, such as a wild boar, on private property.

TWRA Sergeant Kip Kite testified that he is responsible for enforcing hunting, fishing, boating, and littering laws. Sergeant Kite stated that Defendant's hunting license was suspended in 2019 due to the Judgment in this case and is presently suspended. This suspension extends to 2024. Sergeant Kite said Defendant's hunting license was also suspended either in 2004 or 2005. He said this prior suspension related to federal and state cases, and these suspensions expired in March 2007 for the federal case and May 2007 for the state case. Sergeant Kite reviewed the video from October 23, 2021 [Exh. 3], depicting a dead black bear, and stated that it was not legal to hunt black bear on October 23, 2021, because bear season was closed.

Dennis Wayne Wilson testified that he met Veronica Byrd through her husband and that they attend the same church. He said it has been more than one and one-half years since he has spoken to Ms. Byrd. On cross-examination, Mr. Wilson stated that he has known Defendant's family for his entire lifetime, and they all live in the same community. He agreed that Defendant likes to hunt and stated he had been hunting with Defendant and his son Colton in the past. Mr. Wilson said although he and Defendant are neighbors, he is not familiar with how much Defendant hunts. Mr. Wilson identified Defendant and his son Colton in Exhibit 1. He also identified a dead boar in the video. On redirect examination, Mr. Wilson agreed that the boy in the video was wearing "slide-on sandals," which are not appropriate footwear for hunting in the forest. On recross-examination, Mr. Wilson said he has seen Defendant drink beer and whiskey but did not know how much Defendant drinks. He stated that it was not appropriate to drink while hunting.

Jack Hall Watson stated that he has known Defendant since Defendant was a young boy and has known Defendant's son since his birth. He said that he asked Ms. Byrd's landlord if he could set a trap in Ms. Byrd's yard because wild boar were coming onto that rental property and damaging the yard. Mr. Watson said that he and Defendant attempted to set up Defendant's trap in Ms. Byrd's yard, but it was not sufficient, so they set up his (Mr. Watson's) trap. He said Defendant called him to report that a boar was caught in his trap. Mr. Watson said he was not able to go to the trap at that time and told Defendant to allow his son Colton to kill the boar. He said he later saw a video depicting this incident. Mr. Watson reviewed Exhibit 1 and identified Defendant and his son Colton. He agreed that this is the video he saw relating to the incident of the boar trapped on Defendant's girlfriend's property.

On cross-examination, Mr. Watson clarified that Defendant was the one who got permission from the landlord to set the trap in his girlfriend's yard. He said he helped Defendant set up the landlord's trap, but it was not a good trap, so they used Mr. Watson's trap instead. He said Defendant was the one who oversaw the killing of the boar caught in the trap. Mr. Watson said he has a hunting license and is familiar with Tennessee hunting laws. He said he would not join a group that was hunting bear out of season because that would be illegal.

Defendant testified that while dating Veronica Byrd, he was also seeing another woman. He said that he concealed his relationship with the other woman from Ms. Byrd by telling Ms. Byrd that he was hunting, while he was with the other woman, and by sending Ms. Byrd videos indicating he was hunting. Defendant agreed that the dates of the videos presented as exhibits in the revocation hearing correlated with the dates he sent Ms. Byrd videos to suggest he was hunting. He said the videos were old videos and were not recorded at the time he sent them to Ms. Byrd.

Defendant stated that he performs the service of skinning and butchering deer for others in exchange for a portion of the meat. As to the video recording of a deer in the back of a white pickup truck [Exh. 4], Defendant stated that someone killed the deer and contacted Defendant's friend Matthew to ask if Defendant was interested in the deer. Defendant said he told Matthew that he was interested and asked Matthew to bring the deer to his house. He said Matthew brought the deer to Defendant's house in Matthew's white pickup truck. Defendant said he was nervous about the situation because neither he nor Matthew had hunting licenses, but Matthew had the "kill tag" from the man who shot the deer. Defendant said he skinned the deer and cut up the meat.

Defendant also testified about a photograph of a child sitting on a deer in the back of a blue pickup truck [Exh. 5]. He said Matthew hit a deer while driving near Coker Creek, where Defendant lives. Defendant stated that Matthew called him, said he had "hit a good buck" near Defendant's Aunt Jean's property, and that he believed he had killed it. Defendant said he told Matthew that he would take Ms. Byrd's son, who is the boy in the photograph, and collect the deer. Defendant stated that he had to warm up his truck, then he drove to his great Aunt Jean's field, where he located the deer. He said he and Ms. Byrd's son loaded the deer into his truck and took it back to his house. Defendant agreed that was what was pictured in Exhibit 5. Defendant stated that because of the bruising to the deer from hitting the truck, he could only get one tenderloin from it.

Defendant stated that he generally agreed with the testimony regarding the boar caught in a trap on Ms. Byrd's rental property. Defendant explained that his commentary on the video about being in the woods and looking for something to eat as exaggeration for the benefit of his

son. He agreed that in Exhibit 1 and some of the other videos he was being silly to be entertaining.

Defendant said he and Ms. Byrd broke up because Ms. Byrd assaulted his daughter. He said that both his daughter and his son have orders of protection against Ms. Byrd through the Department of Children's Services. Defendant said Ms. Byrd also has an assault charge because she broke his cellphone and kicked his door, causing him to call 9-1-1. He said these actions resulted in Ms. Byrd's indictment for assault in Monroe County, which is pending.

Defendant said his ex-wife sought a stronger restraining order against Ms. Byrd to protect his children. He said two days later, Ms. Byrd posted a video on TikTok, stating "'F' around and find out." Defendant said shortly after that video, the TWRA questioned his friend, and then a week later, federal marshals came to his house on the allegations in the Petition.

On cross-examination, Defendant agreed that he has twice been convicted in this court of hunting over bait, once in 2005 and again in 2019. He agreed that as a result of his 2019 conviction, he is not allowed to go off the paved roads into the Cherokee National Forest or to hunt anywhere in the United States. Defendant denied that he has violated these two conditions of his probation. With regard to Exhibit 6, Defendant denied that this photograph shows him at Fall Branch Falls and said, instead, he was at Spruce Falls in the national park. He had no reason to deny that Exhibit 6 was taken in April 2021. Defendant testified that he questioned the metadata on the photographs from Ms. Byrd's cellphone because Ms. Byrd sent a photograph to Defendant's girlfriend on which "the metadata was not right." Defendant said he no longer had this photograph.

Defendant agreed that he is pictured in Exhibit 7 but denied that this photograph was taken at Coker Creek Falls. He said, instead, Exhibit 7 was taken at Abrams Falls. He agreed he had no reason to dispute that this photograph was taken on May 31, 2021.

Defendant also agreed that Exhibit 8 depicts him and shows the Waucheesi tower, which is inside the Cherokee National Forest. Defendant denied that Exhibit 8 was taken in 2021. He said that in 2018, he and Ms. Byrd had an affair. Defendant said that Exhibit 8 was taken during their affair and is what precipitated his and Ms. Byrd's divorces. Defendant said if the metadata for Exhibit 8 showed that it was taken in 2021, that would be incorrect.

After reviewing Exhibit 1, the video recording involving the boar, Defendant stated that Matthew was going to clean the boar because Defendant had left his knife in the truck. Defendant agreed he was present but standing "up the hill," when his son killed the boar. Defendant agreed that he helped Jack Watson set up a trap. He said he monitored the trap when he was visiting Ms. Byrd. Defendant said he was the one who noticed the boar in the trap, but Mr. Watson was the one who decided to kill the boar. He said both he and Matthew watched his son kill the boar. He agreed that the metadata for Exhibit 1, which states the video was taken on July 31, 2021, is correct. He agreed that he took this video on July 31, 2021. Defendant explained that he did not consider this hunting.

With regard to Exhibit 2, Defendant agreed that he took this video, but he said the metadata, indicating the video was made on October 10, 2021, is wrong. Defendant said Ms. Byrd changed the metadata on this video. He agreed that he was hunting at the time this video was taken but denied that he killed the bear. He agreed that he participated in the activities that led to the killing of the bear. Defendant said this video was taken in 2017 or 2018 because one

13

of the men in the video is dating Defendant's ex-wife, so Defendant would never hunt around that man.

Defendant asserted his Fifth Amendment rights and declined to answer any questions regarding Exhibit 3 because he is charged with separate offenses based upon the conduct in this video. Defendant is charged with hunting during a closed season, hunting with a revoked license, illegal possession of a big game animal, and failure to check in a big game animal, all allegedly occurring on October 23, 2021. Because Defendant asserted his Fifth Amendment right with regard to Exhibit 3, the Court struck all Defendant's testimony on direct examination relating to Exhibit 3 and stated that it would not consider any of Defendant's explanations of his actions in relation to Exhibit 3.

Regarding Exhibit 4, Defendant agreed that his voice is on this video. He agreed this video was taken on October 24, 2021. Defendant also agreed that at the beginning of the video, he said they were taking a break from bear hunting. He agreed that he also mentioned not having a license and that he was referring to a hunting license. Defendant said a man who works for Matthew's father killed the deer in the video. He said his comment that he was taking a break from bear hunting was false.

Defendant denied leaving the note in Exhibit 9 in Ms. Byrd's mailbox and denied that was his handwriting. Defendant said he did not currently own any hunting dogs. He stated that he owns guns. He said he used to use his gun for hunting when he was allowed to hunt. He said when he was allowed to hunt, how often he hunted depended on his work schedule. Defendant said now he works and remodels his house when not working.

Defendant denied hiking with his current girlfriend, Sarah Fitz, in the Cherokee National Forest. He identified a Facebook post from Ms. Fitz from September 11, 2022, stating that he

went hiking with her that day [Exh. 23]. Defendant identified a photograph of him and Ms. Fitz, also dated September 11, 2022, but Defendant stated that the photograph was taken on private land within the Cherokee National Forest [Exh. 24]. Defendant denied leaving Ms. Fitz money to go shopping while he was hunting. Defendant identified a photograph of Ms. Fitz from September 1, 2022, which Ms. Fitz had posted on TikTok [Exh. 25]. He agreed the caption to this photograph states, "If you get up after only one alarm and you leave cash for your GF to go shopping while you're gone, you'll kill the biggest bear today." Defendant also identified a photograph of him and Ms. Fitz from July 11, 2022 [Exh. 26] but denied this photograph was taken on the Cherohala Skyway. Defendant said although he did not remember this photograph, he thought Exhibit 26 was taken on the parkway. Defendant said he did not remember taking a photograph with Ms. Fitz on the Cherohala Skyway.

Defendant stated that in February 2023, a restraining order against Ms. Byrd was changed. He agreed that after this date, he heard from federal agents on the alleged probation violations. Defendant said he was not aware that Ms. Byrd was talking to federal agents months before he was contacted by them.

Regarding Exhibit 5, the photograph of Ms. Byrd's son and a deer, Defendant agreed this photograph was taken in December 2021. He stated that he was not the one who killed the deer in the photograph.

On redirect examination, Defendant testified that his ex-wife found the photograph showing the Waucheesi radio tower on his cellphone and that photograph led to his divorce and Ms. Byrd's divorce. He agreed that the photograph, which shows him and Ms. Byrd embracing, led to the end of his marriage. Defendant said Ms. Byrd was married to someone else at that time and her husband also learned about that picture. Defendant said his divorce was finalized in

15

April 2020. On recross-examination, Defendant said the photograph of him and Ms. Byrd at the Waucheesi radio tower was taken in 2018.

Officer Reece testified in rebuttal that he began investigating Defendant engaging in bear baiting in June or July 2018. Officer Reece said he was familiar with Defendant's appearance in 2018 because he reviewed photographs and videos of Defendant from 2018 and served Defendant with violation notices. Officer Reece said Defendant has lost weight since that time. He reviewed Exhibit 1A, a photograph of Defendant from a video taken on July 31, 2021, and stated that Defendant is thinner in this photograph than he was in 2018. Officer Reece also testified that Defendant looks thinner in Exhibits 6, 7, 8, and 23, than he did in 2018. He stated that Exhibit 26 appears to have been taken at a pull-off area on the Cherohala Skyway, which is in the Cherokee National Forest. Officer Reece denied there are other places near where Defendant lives that provide a view like that depicted in Exhibit 26.

Officer Reece identified a photograph of Defendant taken in July 2018 by a trail camera during the investigation of the bear baiting case [Exh. 27]. He agreed that Defendant appears to be a lot heavier in Exhibit 27 than he does now. Officer Reece identified a second photograph of Defendant from July 2018 [Exh. 28]. He stated that Exhibit 28 depicts the way Defendant appeared in 2018.

Officer Reece testified that all hunters are expected to be familiar with the Tennessee hunting regulations. He said an individual does not have to kill an animal to be hunting. He said if an individual assists another person who is hunting then the individual is also hunting.

On cross-examination, Officer Reece said that any actions an individual does that results in the ultimate killing of an animal could be assisting in hunting and, therefore, considered hunting. As examples of assisting in hunting, he listed communicating with someone who is

bear hunting about the location of their dogs, carrying the animal out of the woods after it is killed, gutting the animal, and providing a firearm for someone else to use in hunting. Officer Reece said that helping unload a dead animal at another location, such as a house, is not hunting because the animal has already been killed. He agreed that actions taken after the animal is dead would not be hunting.

## II.    ANALYSIS

A court may revoke a sentence of probation and resentence a defendant if it finds, after a hearing pursuant to Federal Rule of Criminal Procedure 32.1, that defendant has violated a condition of probation. 18 U.S.C. § 3565(a)(2); *United States v. McKibben*, 2022 WL 2681971, at *2 (S.D. Ohio July 7, 2022). "Probation revocation hearings involve two analytically distinct stages: 1) a factual determination of whether the probationer has violated a condition of probation; and 2) a discretionary determination of whether violation of a condition warrants revocation of probation." *United States v. Bujak*, 347 F.3d 607, 609 (6th Cir. 2003). In the first stage, the court must find that a probation violation occurred by a preponderance of the evidence. *Id*. Upon finding a violation of probation, "the court can either continue probation or revoke probation in favor of incarceration." *Id*.; *see also* 18 U.S.C. § 3565(a).

For the reasons discussed below, the Court finds that Defendant McJunkin has violated both special conditions of his probation and exercises its discretion to revoke his probation.

### A.  Probation Violations

The Court first examines whether Defendant in fact violated a condition of probation. As stated above, the Court makes this finding upon a preponderance of the evidence. *Bujak*, 347 F.3d at 609. Although "[a] single violation of a condition of probation is enough to revoke probation," *Latson v. United States*, 68 F. App'x 544, 549 (6th Cir. 2003), here the Court finds

by a preponderance of the evidence that Defendant has violated both special conditions of his probation repeatedly and with impunity.

The Court finds by a preponderance of the evidence that Defendant trapped a boar on July 31, 2021, and as such, was hunting. Jack Watson testified that Defendant contacted Ms. Byrd's landlord and asked to install a trap to catch wild boar coming onto the landlord's property. Defendant assisted Mr. Watson in installing the trap, which belonged to Mr. Watson. Defendant monitored the trap and reported to Mr. Watson that a boar was caught in the trap on July 31, 2021. Defendant stated that he watched his son kill the boar. Exhibit 1, the video recording of Defendant narrating while his son poses in a clearing with a dead boar, corroborates the testimony of Defendant and Mr. Watson regarding trapping the boar. Defendant agreed that this video was taken on July 31, 2021, which is during the time that he was prohibited from hunting.

Defendant argues that assisting in trapping a boar on private property is not hunting. However, hunting is defined as

> chasing, driving, flushing, attracting, pursuing, worrying, following after or on the trail of, searching for, trapping, shooting at, stalking, or lying in wait for, any wildlife, whether or not such wildlife is then or subsequently captured, killed, taken, or wounded and every act of assistance to any other person, but "hunting" does not include stalking, attracting, searching for, or lying in wait for, wildlife by an unarmed person solely for the purpose of watching wildlife or taking pictures of wildlife[.]

Tenn. Code Ann. § 70-1-101(18). Thus, trapping, which is defined as

> taking, killing, and capturing wildlife by the use of any trap, snare, deadfall, or other device commonly used to capture wildlife, and the shooting or killing of wildlife lawfully trapped, and includes all lesser acts such as placing, setting, or staking such traps, snares, deadfalls, and other devices, whether or not such acts result in taking of wildlife, and every attempt to take and every act of

18

> assistance to any other person in taking or attempting to take
> wildlife with traps, snares, deadfalls, or other devices[,]

is expressly included in hunting. Tenn. Code Ann. § 70-1-101(37). Defendant contends that the boar was trapped and killed on private property, rather than in the national forest. But Defendant is prohibited from hunting anywhere. Accordingly, the Court finds by a preponderance of the evidence that Defendant violated his hunting ban by setting up a trap, trapping a boar, and assisting in the killing of the boar during the time of his hunting ban.

The Court also finds that Defendant was hunting on October 23, 2021; October 24, 2021; and September 1, 2022. In Exhibit 3, dated October 23, 2021, Defendant records a video of his friend Matthew, some hunting dogs, two guns, and a dead bear. In his narration, Defendant states that he and Matthew are helping the hunting dogs, which treed an animal. On Exhibit 4, which is dated the following day, Defendant states that he and Matthew are taking a break from bear hunting and that neither of them have "licenses." In his testimony, Defendant acknowledged he was referring to hunting licenses. Exhibit 4 depicts a dead deer lying in a pool of blood in the bed of a pickup truck. On the video recording, Matthew comments about "shedding first blood." Exhibit 25, dated September 1, 2022, is a social media post by Defendant's current girlfriend Sarah Fitz, who comments that because her boyfriend has left her money to go shopping, she believes he will kill the biggest bear that day. Defendant argues that Exhibit 4 depicts a deer legally killed by someone else and brought to him by Matthew to butcher. However, Defendant's explanation is belied by his commentary on the video, which states the two friends have been out together "riding the roads." Defendant does not dispute that Exhibits 4 and 25 occurred during his hunting ban.

Moreover, even if the Court were to consider Defendant's explanation that the screen shot of the October 23, 2021 date for Exhibit 3 does not show the date on which the video was

19

taken,[3] the Court does not credit this testimony. First, Defendant's allegations that he sent Ms. Byrd an old hunting video on the date depicted on the screen shot to fool her as to his whereabouts and his testimony that Ms. Byrd changed the metadata for the video are inconsistent. Second, the fact that Defendant was bear hunting with Matthew on October 23, 2021, is corroborated by his comment on the following day, October 24, 2021, on Exhibit 4, that he and Matthew were taking a break from bear hunting. Finally, Ms. Byrd testified that Defendant went hunting most weeks and that he told her that he killed the bear in Exhibit 3.

Defendant argues that Ms. Byrd's testimony is not credible. He argues that she was convicted of theft, an act of dishonesty, and she has multiple reasons to lie based upon his infidelity during their relationship, an order of protection prohibiting her from contacting his children, and a pending criminal assault charge. However, the Court finds Ms. Byrd's testimony about Defendant hunting during his ban is corroborated by the videos she provided[4] and the evidence recounted above, including Ms. Fitz's social media post [Exh. 25]. Accordingly, the

---

[3]     The Court struck Defendant's testimony that Exhibit 3 was not recorded during his hunting ban because on cross-examination, Defendant chose to exercise his Fifth Amendment right against self-incrimination as to Exhibit 3. *See United States v. Gullett*, 713 F.2d 1203, 1208–09 (6th Cir. 1983) (holding that if assertion of the privilege against self-incrimination prevents inquiry into the elements or specific events of the offense, the witness's direct testimony may be stricken in whole or in part); *United States v. Stephens*, 492 F. 2d 1367, 1374–75 (6th Cir. 1974).

[4]     Exhibit 2 depicts Defendant as a member of a hunting party. The screen shot from Ms. Byrd's cellphone shows she received this video on October 10, 2021. The Court does not rely on this video for a specific incident of Defendant hunting, although the Court finds it generally supports Ms. Byrd's testimony that Defendant hunted weekly for most of the year during his hunting ban. The Court also does not rely on Exhibit 5, the photograph of Ms. Byrd's son sitting astride a dead deer in the bed of Defendant's pickup truck and dated December 28, 2021. Although Ms. Byrd testified that Defendant shot the deer that night while "spotlighting," no blood is evident in Exhibit 5 (unlike in Exhibit 4), and, thus, the photograph does not demonstrate that the deer had been shot. Officer Reece testified that butchering an animal after the animal was killed by another person in a separate location is not assisting in hunting. In contrast to the video recordings, the photograph of Ms. Byrd's son sitting on the deer [Exh. 5] itself does not show that Defendant engaged in hunting.

Court finds by a preponderance of the evidence that Defendant violated his hunting prohibition on at least four occasions in 2021 and 2022.

The Court also finds that Defendant violated the condition of probation prohibiting him from entering any national forests, including the Cherokee National Forest, other than by driving on paved roads therein. Exhibit 8 depicts Ms. Byrd and Defendant in front of the Waucheesi radio tower, which is in the Cherokee National Forest. This photograph is dated June 13, 2021. Officer Reece corroborated the location depicted in this photograph as the Waucheesi radio tower and testified that Defendant would have had to travel on gravel roads and on foot into the national forest to get to this location.

Defendant argues that the photograph in Exhibit 8 was taken in 2018, before his current term of probation, and that Ms. Byrd has manipulated the date on the screenshot. As support for this contention, Defendant testified that he and Ms. Byrd had an affair while they were both still married and that this photograph was taken in 2018 during that affair. Defendant stated that this photograph was subsequently discovered on his cellphone by his then wife, leading to both his and Ms. Byrd's divorces. However, Officer Reece testified that based on photographs of Defendant in 2018, Defendant appeared heavier than in Exhibit 8, indicating that Exhibit 8 was taken in 2021, rather than in 2018. Moreover, the record is devoid of any evidence that Ms. Byrd altered the dates on the videos and photographs introduced into evidence or that she knew how to do so. Defendant agrees that five of the eight videos and photographs, Exhibits 1, 4, 5, 6, and 7, were taken on the dates appearing on the screenshots. The Court finds by a preponderance of the evidence that Defendant entered the Cherokee National Forest, other than on a paved road, on June 13, 2021.

Ms. Byrd produced two additional photographs [Docs. 6 & 7], which she testified were taken while she and Defendant were hiking in the Cherokee National Forest on April 11, 2021, and May 31, 2021. Defendant does not challenge the dates associated with these photographs but denies they were taken inside the national forest. Officer Reece, who is assigned to the Tellico Range District of the Cherokee National Forrest, identified Coker Creek Falls in Exhibit 7.[5] The Court finds that these two photographs, particularly Exhibit 7 which was corroborated by Officer Reece, also support Ms. Byrd's testimony that she and Defendant went hiking in the Cherokee National Forest during their relationship. Accordingly, the Court finds by a preponderance of the evidence that Defendant violated the condition prohibiting his entry into the Cherokee National Forest, except for travel on paved roads through the forest.

## B. Revocation is Warranted

The Court next turns to whether Defendant's violations warrant the revocation of his probation. In making this discretionary determination, the Court must consider the factors in 18 U.S.C. § 3553(a) to the extent they apply. 18 U.S.C. § 3565(a); *McKibben*, 2022 WL 2681971, at *3. Relevant is "the need for the sentence imposed—"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

---

[5] Officer Reece also identified the location of Exhibit 26, the photograph of Defendant and Ms. Fitz from July 11, 2022, as being the Cherohala Skyway in the Cherokee National Forest. There was no testimony regarding whether this photograph was taken from a paved road within the national forest. Accordingly, the Court does not rely on this photograph as supporting a probation violation.

18 U.S.C. § 3553(a)(2). "The Court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range established for the applicable offense, any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentence disparities among defendant[s] who are similarly situated, and the need to provide restitution to any victims." *McKibben*, 2022 WL 2681971, at *3 (citing 18 U.S.C. § 3553(a)(1) & (3)–(7)). The Court need not make findings as to each of the § 3553(a) factors but must "'articulate enough of its reasoning to permit an informed appellate review.'" *Id*. (quoting *Bujak*, 347 F.3d at 610).

The Court finds the nature and circumstances of the violations warrant revocation. Defendant repeatedly violated his hunting ban and, in the process, violated other hunting regulations such as the licensing requirement. Exhibit 3 depicts Defendant having hunted and killed a bear on October 23, 2021. TWRA Officer Kite testified that this date was not during bear season. Also on Exhibit 3, Defendant remarks that his head is still fuzzy preventing him from accurately counting the number of hunting dogs present, and he alludes to drinking whiskey the night before as the reason for this condition. Officer Reece and Mr. Wilson testified that it is dangerous to mix drinking and hunting. Thus, the circumstances of the October 23, 2021 probation violation were especially egregious in that Defendant was not only violating his probation but was committing other hunting violations.

As to Defendant's history and characteristics, the Court observes that Defendant has numerous convictions for hunting violations in the national forest from 2005 and 2019. These prior convictions and the attendant loss of his hunting license and bans from the national forest appear to have not deterred Defendant from other hunting violations or from violating the conditions imposed by this Court.

23

The Court must also consider the need to promote respect for the law and to deter other violations. Ms. Byrd testified that Defendant told her he continued to hunt, despite the condition of probation prohibiting hunting, because he wanted to recoup funds he spent on attorney fees and fines in relation to this case. She also testified that Defendant considered it a game to go into the national forest without detection. This testimony, along with the evidence of Defendant's repeated violations of his conditions of probation, reveal that revocation is necessary in this case to promote respect for the law and to deter Defendant from further violations.

Finally, the Court finds that continued probation is not sufficient to protect the public from further hunting violations by Defendant. Ms. Byrd's testimony and the videos and photographs, including a social media post by Defendant's current girlfriend, reveal that Defendant has continued hunting throughout his five-year hunting ban. The Court again notes that Defendant may have been intoxicated while hunting in Exhibit 3, which is dangerous to the public.

After considering the applicable factors from § 3553(a), the Court finds that Defendant's term of probation should be revoked and that he must be resentenced. *See Bujak*, 347 F.3d at 610 (holding that if a defendant's sentence of probation is revoked, he must be resentenced); *McKibben*, 2022 WL 2681971, at *3 (same).

## III.   CONCLUSION

For the reasons stated herein, the Court **GRANTS** the Government's Petition [**Doc. 6**] to revoke Defendant's probation. The Court finds by a preponderance of the evidence that Defendant has violated both special conditions of his probation. After consideration of the applicable factors in § 3553(a), the Court also finds that revocation is warranted, and Defendant shall be resentenced. Accordingly, Defendant's probation will be revoked at his resentencing

hearing.  Defendant **REMAINS** on the current conditions of probation until resentencing.  The Court will contact the parties to schedule a resentencing hearing.

      **IT IS SO ORDERED.**

ENTER:

_____
Debra C. Poplin
United States Magistrate Judge